If it pleases the court, on behalf of the petitioner, we would like to point out in the case of Mandarini v. Holder, the erroneous factual and legal analysis by the immigration judge, the BIA, and the respondent that have led to the erroneous decisions in this case. First of all, the petitioner is a person of Christian religion and mixed Chinese ethnicity, and she was born in Indonesia, and she filed for asylum within the one-year deadline, so there's no issue as to any timely filing. When the immigration judge made the decision, despite the fact that the petitioner is of mixed Chinese ethnicity, the judge concluded that the disfavored group analysis was not applicable to her. That, in itself, is a factual error, and that, from then, that led to — Why is that a factual error? What was the reasoning, and why was it something that a factual determination that any reasonable adjudicator would be compelled to conclude to the contrary? Okay. In the record, she mentioned that she was of Chinese ethnicity from her mother's side, and that her grandmother was clearly Chinese, and that's Administrative Record, page 176. Despite that, because of the current case law at the time, the case law of Sahel versus Ashcroft was based on the petitioner in Sahel's case being Chinese, so the analysis by the Ninth Circuit was about Chinese Christians in Indonesia. And because of that, the whole premise of the disfavored group at that time seemed to be that you had to be Chinese in order to fall into the disfavored group analysis. So she did say she was mixed. I mean, that doesn't preclude — But what was — where did she live in Indonesia? I think she lived in Jakarta. Yes, in Jakarta. And what evidence was there that people of Chinese descent, or even in the FKM, were being persecuted in Jakarta? Because I would think that whatever the factual findings were in another case would not be the evidence in this case. Your Honor, I don't think in the case of the judge's decision that the location was the issue in deciding that the disfavored group analysis wasn't applicable. It was based on her not being Chinese. In any event, this situation has since changed because, as the respondent had correctly pointed out in their Notice of Supplemental Authority, that the case of Thampu Polon, which is T-A-M-P-U-B-O-L-O-N, which is a Ninth Circuit case, 610 at 1056 Ninth Circuit, 2010. I mean, in that case, you know, the Ninth Circuit did hold that Christians are a disfavored group in Indonesia. And that — But you still need to show some level of individualized persecution. Yes, Your Honor. What is that here? Sorry, Your Honor. Oh, yes. What was it showing you? Yes, Your Honor. In the facts of the case, she was clearly asked if she was a Christian. And when she said yes, her bag was seized and she was thrown out from a bus, and she was injured as a result. In the other incident, she was — she and her mother, they were riding in a car, and the Bible that her mother has was at a dashboard. And because of the Bible, the car was hit with a stick. So we understand there's different levels of being recognized. But if you're recognized, you know, not by your name, but by, you know, some kind of, you know, response to a question like, are you a Christian, I would say that is very clear. That's a clear and, I would say, deplorable form of discrimination by other individuals. That, it seems to me at the moment, that doesn't — that's not persecution by the government, and doesn't there have to be a link to a group that the government is permitting to engage in this kind of violent discrimination? I understand, Your Honor. And this is where I think that this favor group analysis is critical, that it has to be applied. And I believe that the whole analysis by the immigration judge, the BIA, and also by the respondent was premised on the disfavored group analysis not being applicable. Therefore, the legal analysis — Counsel, Judge Gould, if I could interject or show me — give me the — my understanding was very specifically that the immigration judge said first that the respondent is not a member of the disfavored group identified in Sayle because she's not Chinese. Yes. So that's what he said first. But then he went on to say, however, even if she is considered Chinese, Sayle is not applicable for the following reasons. And then in the next paragraph of his analysis, he seems to give the disfavored group analysis negative for your client. So, you know, why would we have to remand on that issue? Because it seems like all three — he said she's not Chinese, but even if she is, the Sayle analysis doesn't give her relief. Your Honor, because I believe that based on — I believe that there is improper weighing of the factors between — Are you familiar with this paragraph that I'm referring to? Yes, Your Honor. It's at page 15 of the decision. So why don't you focus on the immigration judge's specific reasoning where he says she would not get relief under the disfavored group analysis and just give me your best argument as to where he's wrong. Yes, I believe that based on what I read, that they have — the judge mentioned about the improvement of the conditions in Indonesia. But in Sayle, there was also the recognition that there's a waxing and waning of conditions and country conditions where the Chinese all of a sudden can become a scapegoat. And I believe that, you know, that's part of the waxing and waning situation that the judge did not consider. So that's why I believe that the legal analysis is not correct. And also there was improper weighing because there was already the idea that she's not Chinese. And therefore, from there, I'm not sure if the whole legal analysis, even if, you know, arguendo, even that is correct, also compounded with the analysis about the country condition. Okay, thank you. I appreciate that. Yes. My understanding was that the — what the IJ was basically saying was that under that Sayle analysis, he had not shown she was at particular risk. She hadn't shown enough particularized risk. And maybe you could address that issue. Apart from the incident where she shoved off the bus and the incident where someone's beating on the car at the stoplight pointing to the Bible, what else has she shown that shows particularized risk? Your Honor, that would be what she has in the record, Your Honor. What the IJ said was that in both those instances, she didn't know who her attackers were. They were unknown to her, and she was unknown to them. So how can you infer from that that they would attack her again? As I had mentioned earlier, there's different levels of being recognized. You can be — you may not be recognized by your name. You may not recognize who your attacker is. But if your attacker has specifically asked you, are you a Christian, the attacker is not going to be interested in finding out her name. The perpetrator is interested in her specific religion. And in this case, she was — in her response that she's a Christian, she was clearly singled out as a Christian because the mistreatment came immediately after she responded that she was a Christian. So, Your Honor, I believe that in the case of Sa'el, where she may have been known by her name, that's distinguishable because if you have another specific situation where you are identified, but in a different way, not by your name, but by your religion, that is a very clear-cut singling out on account of someone's religion. I humbly submit. So — and also being recognized by having a Bible on your dashboard. I mean, you don't have to say, like, this is Mary's Bible. I mean, this is the Bible on the dashboard, and they've recognized it, and they singled out the car for it. May I ask you this, if we can just take another minute or two? Was Ms. Mandarini required to prove that she had a subjective fear of persecution that was objectively reasonable to obtain asylum? Yes. And I believe the record shows that she returned to Indonesia several times. How, you know, it can be is argued that that undercuts a finding that there's no subjective fear. How do you address that? Yes. I did address that on page 17 of my brief, but I will briefly mention that the case law of Smolniakovia, which is the Russian case, 422 after 1037, 9th Circuit, 2005. In that case, the court held that an applicant's credible testimony compelled the conclusion that her fear of being harmed in Russia was objectively well-founded, despite her three trips to the country. So it is ironic that in my client's case, it was also three trips back to a country. In the case of Smolniakovia. But each case is unique. Yes. Yes, Your Honor. Did the immigration judge in this case find that she did have the subjective fear? Yes. I believe they recognized that she was subjectively afraid, but objectively she wasn't. And anyway, in the Russian case, the person went back to take care of her dying mother. In the case of my client, she mentioned in Administrative Record 192 that she returned to Indonesia due to her parents being there and on many other considerations. And then there was no further probing as to what those considerations were. So the record remains that it was for parents and many other considerations. Can I ask a question on your motion? Yes. Was the husband inadvertently left off the petition before us as a writer? Yes, Your Honor. So you're claiming to have him at it before us? Yes. It was due to an oversight. What had happened was the BIA decision clearly included him as a writer. But when we filed the initial petition, we had omitted to include him. And later on, when I filed the opening brief, I realized the error, and we petitioned or motioned the court to please include him because he was included at all other levels. If the court could kindly have him included. All right. You're over your time. Thank you very much. Thank you. Good morning, Your Honors. May it please the Court, my name is Jennifer Singer, and I represent the United States Attorney General, the respondent in this matter. I'd like to first start off by addressing the motion that Your Honor just referenced. The respondent withdraws its opposition to the motion. That didn't come to light until after respondent filed their brief in the matter, and we included reference to petitioner's husband. And given that he's a writer, we are withdrawing our objection to that motion. Okay, thank you. In any event, the primary issue in this case is whether the petitioner has established that her fear of future persecution in Indonesia is objectively reasonable. She has not, and the record does not compel a contrary conclusion. And I will address each of her claims in turn. First, the petitioner claims that she will be persecuted in Indonesia in the future based on the fact that she's Christian. Well, respondent acknowledges that since the petitioner's administrative proceedings, this Court issued its decision in Tanpubulan, in which the Court held that Christians in Indonesia are a disfavored group. However, Tanpubulan does not alter the decision in this case, and it shouldn't either, and this is so for two reasons. Even assuming that the petitioner is a member of a disfavored group of Christians in Indonesia, she still has not demonstrated the requisite level of individualized risk of future persecution, as the immigration judge concluded. The past two incidents of harm that she described are in the nature of happenstance and randomness and don't demonstrate that she will face a greater chance of harm as a Christian than any other member of the Christian population in Indonesia. The incident on the bus, she was not targeted for being Christian. A man approached her, asked her about if she was from the Moluccan Islands, and then asked her if she was a Christian, and she voluntarily offered information that she was. So I want to understand the Moluccan Island situation and the FKM. Is the population of Molucca, the Moluccan Islands, is it largely Christian? Based on my understanding from the record, there's northern Moluccan Islands and southern Moluccan Islands, and the southern part of the Moluccan Islands are predominantly Christian, and the FKM is Moluccan Sovereignty Front, which is an organization mainly based in the United States that promotes the regaining of independence of those islands from the Indonesian government. While Petitioner also asserts that she fears harm because she is ethnically Moluccan, there's nothing in the record to demonstrate that Moluccans are different from any other native populations of Indonesia. In fact, when the petitioner was asked what the difference is between Moluccans and native Indonesians, she described the difference in a manner, and then she acknowledged that she herself fell outside her own description of what the difference is between Moluccans and native populations are. Does the government of the United States regard the FKM as a terrorist organization? That exactly I don't know. The immigration judge did engage in an analysis and concluded that the FKM wasn't. I would submit, however, that her claim of future persecution based on her membership in FKM is waived, as she did not raise the issue in her brief to this board. Even assuming she didn't waive on the merits, they're still not sufficient. She didn't show enough evidence that she would individually be persecuted in Indonesia based on her membership in the FKM. Doesn't the government have a list of organizations that it considers terrorist organizations? The United States government does. I don't know if today the FKM is on the list or not. I would think the IJ could have looked that up, since it seemed to be an issue of concern to him. Correct. Even so, I don't think the petitioner has demonstrated enough sufficient risk of individualized harm on that basis. Going back to her claim of being persecuted on account of her Christianity, the court's subsequent decision in Tanpublin does not require remand here, nor is the petitioner entitled to relief based upon that decision. The petitioner has not shown that she's prima facie eligible for relief based on a Christian disfavored group claim. She has not shown sufficient individualized risk on that basis. Just procedurally in relation to that, the motion which you've withdrawn your opposition from, the husband was also not included in the stay of removal, so I'm wondering whether the husband has been removed. To my knowledge, he has not. Okay. I believe in the respondent's non-opposition to the motion, I believe the respondent, I think, that we included him on the title of the non-opposition. The agency also analyzed the petitioner's claim on the sale, disfavored group analysis, and as Your Honor pointed out, the petitioner never claimed that she was feared persecution on account of being a Chinese. She mentioned in passing that perhaps a grandmother had Chinese ethnicity, but in her asylum application and in her testimony before the court, she never once claimed fear based on her status as Chinese. That notwithstanding, the immigration judge did assume for purposes of a disfavored group analysis that she was ethnic Chinese, and given her lack of individualized risk analysis, the immigration judge did not err in concluding that she was not entitled to relief on that basis. In short, the petitioner failed to demonstrate her eligibility for withholding of removal and asylum, and she waived her claim to protection of the Convention Against Torture. If Your Honors don't have any further questions, then the respondent will submit on the briefs. Is the standard to meet? Oh, I'm sorry. Go ahead, Judge Gould. I was just going to say I have no questions. Thank you. Thank you, Your Honor. Is the standard to be satisfied in the Convention Against Torture higher than the standard for obtaining asylum? It's different. The petitioner would need to show that it's more likely than not that she would be tortured, as opposed to being simply persecuted upon return to Indonesia. She's waived that claim. Yeah, under the CAT, it doesn't have to be on account of a protected ground. You're correct, Your Honor. Thank you. But she in any event has waived that by failing to raise that in her brief as well. All right. Thank you, Counsel. Okay, the case of Mandarini v. Holder is submitted.
judges: Wolf, Wardlaw, Gould